**Chester SPATT, Plaintiff,**

v.

**The STATE OF NEW YORK et al.,**
**Defendants.**

**No. 72 Civ. 1120.**

United States District Court,
E. D. New York.

May 25, 1973.

Chester Spatt, pro se.

Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, for defendants; Samuel A. Hirshowitz, First Asst. Atty. Gen., David R. Spiegel, Deputy Asst. Atty. Gen., of counsel.

Before MANSFIELD, Circuit Judge, and WEINSTEIN and JUDD, District Judges.

MANSFIELD, Circuit Judge.

On August 24, 1972, plaintiff, Chester Spatt, a resident of New York and a student at Princeton University, New Jersey, commenced this action by filing a *pro se* complaint requesting that a three-judge panel be convened, 28 U.S.C. §§ 2281, 2284, to declare unconstitutional New York Education Law § 602(5)(b) (McKinney's Consol. Laws, c. 16, 1972 Supp.). The latter statute restricts eligibility for payments of financial assistance pursuant to New York's Regents Scholarship Program to those otherwise eligible students who are "matriculated in a program of study approved by the regents in *an institution situated in the state. . . .*" (emphasis supplied). The complaint also seeks an injunction restraining the appropriate state officials from denying him certification and financial assistance as a Regents Scholarship winner merely because of his attendance at an out-of-state college.

Spatt took the competitive Regents Scholarship examination and achieved a score higher than the minimum necessary for a scholarship award. He contends that § 602(5)(b), which mandates refusal of financial assistance to him solely because he is attending an educational institution not situated in New York, denies him the equal protection of the laws and unconstitutionally burdens interstate commerce. The initial complaint named only the State of New York as a defendant. A subsequent amendment added the New York State Commissioner of Education, the Governor, the State Comptroller, and the State Department of Education.

The complaint was initially dismissed by Judge Weinstein on December 8, 1972, for lack of substantiality of the constitutional questions raised and for failure to state a claim upon which relief can be granted. But on January 16, 1973, after receiving a memorandum from Spatt in support of a motion to vacate the dismissal, Judge Weinstein con-

cluded that Spatt's *pro se* pleadings, taken together, could not be called insubstantial on their face. Thereupon he vacated the previous dismissal and granted the motion for the convening of a three-judge court. Subsequently defendants discovered that Spatt had instituted an action against the State of New York on May 1, 1972, in the State Court of Claims, Albany County, raising the same questions as are sought to be litigated here. On August 4, 1972, the Court of Claims, in a memorandum opinion by Judge Milton Alpert, dismissed his complaint. No appeal was ever taken, although § 24 of the Court of Claims Act (McKinney 1972 Supp.) provides for an appeal to the Appellate Division of the Supreme Court of the State of New York. Instead, before the time for appeal in the state courts had expired, *id.* § 25, Spatt filed his complaint in the present action. Defendants moved on March 29, 1973, to dismiss plaintiff's federal complaint on the ground of *res judicata.*

▮ Turning first to the question of whether the action must be dismissed on grounds of *res judicata,* we start with the general principle that when a party in the first instance chooses to submit his federal claims for decision by the state courts and has them decided there, he may not ignore an adverse decision and seek to relitigate them in a federal district court. England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 419, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).[1] His remedy is to take his appeal through the state courts and perhaps ultimately to the Supreme Court. Applying this principle here, upon Spatt's failure, within the time prescribed by law, to appeal from the judgment of the Court of Claims, that judgment became final and conclusive as to the issues litigated and determined between the State and himself and those in privity with them. Wilson's Executor v. Deen, 121 U.S. 525, 7 S.Ct. 1004, 30 L.Ed. 980 (1887); see 1B J. Moore, Federal Practice ¶ 0.416[1] at 2202, ¶ 0.416[5] at 2305–06 (2d ed. 1965).[2] Disposition of the *res judicata* defense therefore depends upon what claims were adjudicated in the state action.

Spatt's constitutional claims in the state court action are substantially the same as those raised here.[3] With re-

---

1. In *England* the plaintiff first commenced an action in the federal district court and later, after that court abstained from deciding federal issues before it until a state court had construed its pertinent statute, brought suit in the state court, which adjudicated his claim adversely to him. Holding that he was precluded from thereafter obtaining an adjudication of his federal claims in the federal action, the Supreme Court stated that if the "party freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there, then—whether or not he seeks direct review of the state decision in this Court—he has elected to forgo his right to return to the District Court." 375 U.S. at 419, 84 S.Ct. at 467.

2. The State, which was sued directly in the prior Court of Claims action, and its officials and Department in the present action represent the same interest in defending the validity of the statutory limitation of Regents Scholarship payments to students attending in-state higher educational institutions. The officials and Education Department, therefore, are in privity with the State as far as the effect of the Court of Claims judgment is concerned. See 1B J. Moore, *supra,* ¶ 0.411[1]. Furthermore, both our Court of Appeals "and the New York Court of Appeals permit a prior judgment to be invoked defensively as against the unsuccessful party in the prior action, where the issues are the same and have been fully litigated. Zdanok v. Glidden Co., 327 F.2d 944 (2nd Cir. 1964); First Congregational Church and Soc. of Burlington, Iowa v. Evangelical & Reformed Church, 305 F.2d 724 (2nd Cir. 1962); Israel v. Wood Dolson Co., 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E.2d 97 (1956)." Fleischer v. Paramount Pictures Corp., 329 F.2d 424, 425 (2d Cir.), cert. denied, 379 U.S. 835, 85 S.Ct. 68, 13 L.Ed.2d 43 (1964).

3. The complaint filed in the Court of Claims alleged that the State's refusal of Regents Scholarship assistance, because Spatt attends an out-of-state rather than an in-state institution of higher learning,

spect to the State's defense that the Court of Claims lacked jurisdiction Judge Alpert, in his decision of August 4, 1972, concluded that the State had not waived its immunity with respect to the exercise of what he considered to be the governmental function of certifying scholarship recipients for the Regents Scholarships, and thus the Court of Claims lacked jurisdiction over the claim. See Court of Claims Act §§ 8, 9 (McKinney 1963); Gross v. State, 33 A.D.2d 868, 306 N.Y.S.2d 28 (Sup.Ct. 1969). He went on to state, however, that assuming the Court of Claims had jurisdiction over the claim it still had to be dismissed on the merits of the constitutional challenge because "the statutory requirement to have the Regents Scholarship used at a college located within the State of New York is . . . a valid legislative enactment."

Thus, while Judge Alpert did find that there was no jurisdiction to hear the claim, he also considered the merits of the claim, which is the same claim as that sought to be raised here, and expressed his view that the merits of the claim should be resolved adversely to plaintiff.

 Since it was Spatt who asked the Court of Claims for relief, urging that it had jurisdiction, we might well conclude that his failure to appeal Judge Alpert's decision should preclude him from seeking a new initial determination in a federal district court. Cf. Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947) (diversity suit). The question of whether the Court of Claims did have jurisdiction to hear the claim is best presented to the state appellate courts. Normally a plaintiff would not be allowed to ignore the essentially alternative holding on the merits when an appeal is available in the state courts and seek a *de novo* determination in federal court of the merits of his constitutional claim. See Taylor v. New York City Transit Authority, 433 F.2d 665, 668 (2d Cir. 1970). On the other hand, a judgment rendered by a court lacking competency is void, even though the party against whom it is rendered does not object to the competency of the court. Restatement of Judgments § 7 (1942) and Comment d.

 Tempted as we are to rule that since Spatt urged and accepted the competency of the state court, which then stated its views as to the merits, he should exhaust the state appellate process before invoking federal jurisdiction, there are countervailing factors in the present case. Here the state court, rather than erroneously assuming or maintaining that it possessed jurisdiction, has unequivocally ruled that it lacks jurisdiction over the claim, which casts doubt upon the *res judicata* effect to be given to its expression as to the merits.[4] Cf. 1B J. Moore, *supra*, ¶ 0. 409[2] at 1021–22. Absent a showing that its jurisdictional ruling was erroneous, we would not be inclined to require a plaintiff in effect to reject that determination, even in a case where it is accompanied by a volunteered statement on the merits. Accordingly, although the matter is not free from doubt, we are

---

constituted a discriminatory classification that violates the " 'equal protection' clauses of the 14th amendment . . . and of Article I. Section II of the New York State Constitution, the 'full faith and credit' provision in the federal constitution [and] the prohibition on the state passage of import taxes (e. g. on an out-of-state higher education) without Congressional approval and Congressional regulation of interstate commerce." He requested the same $100,001.00 damage recovery in both actions.

4. The situation here is to be distinguished from that where a court has erroneously found itself to *possess* jurisdiction, in which event *res judicata* effect might be given to its determinations unless the policy underlying that doctrine is outweighed by the policy against permitting a court to act beyond its jurisdiction, *compare* Restatement of Judgments § 10 (1942) *with* 1B J. Moore, *supra*, ¶ 0.405 [4.–1] at 647–653.

prepared to accept at face value the state court's jurisdictional determination, especially since it will afford the *pro se* plaintiff a determination on the merits of his constitutional claims, which appear to us to be considerably less open to question than does the issue as to the *res judicata* effect of the Court of Claims opinion.

Turning to the merits, Spatt's first contention is that it is a denial of equal protection for the State, acting pursuant to New York Education Law § 602(5)(b) (McKinney 1972 Supp.), to refuse financial assistance to Regents Scholarship winners who, like himself, attend out-of-state colleges, while granting such assistance to those winners who attend institutions located within New York State. This discrimination, Spatt contends, penalizes the exercise of the student's "fundamental" right to travel interstate and can be upheld only upon a showing that it is justified by a "compelling governmental interest," Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Dunn v. Blumstein, 405 U.S. 330, 338–342, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972). We disagree.

In *Shapiro* and *Dunn* the persons who had recently migrated to their new home states were denied, solely because of their interstate movement, benefits which longer term residents were afforded—in the one case the very means of subsistence and in the other the fundamental right to vote. See also Keenan v. Board of Law Examiners, 317 F.Supp. 1350 (E.D.N.C.1970) (3-judge court) (one-year durational residency requirement before an applicant could take the state bar examination unconstitutionally burdened the right to travel because it forced the applicant to give up his profession for a year solely because he had recently exercised his right to travel interstate). No such penalty is inherent in a state law which makes scholarship aid available only to a student attending college in that state. Al-

though his eligibility for scholarship aid may give him an incentive to attend school where such financial assistance will be available, it represents but one of many factors considered by a student in selecting the college he wishes to attend. He remains free to migrate interstate to attend an institution elsewhere without loss of such basic fundamentals as the means for survival, his franchise, or his right to practice his chosen profession. Although he may not, if he attends an out-of-state college, avail himself of New York's Regents Scholarship assistance, he is not denied the right to seek similar assistance, to the extent that it is available, from the state or institution to which he travels. Indeed, Spatt himself is presently attending Princeton University. In short, New York's effort to attract scholarship winners to attend educational institutions located within its borders does not, in our view, impose a penalty or deprivation in any constitutional sense.

For these reasons we believe that the Regents Scholarship restriction does not fall in the category of "penalties upon the exercise of the constitutional right of interstate travel." Shapiro v. Thompson, *supra*, 394 U.S. at 638 n. 21, 89 S.Ct. at 1333. Nor can it be contended that the strict scrutiny standard, requiring the showing of a compelling governmental interest to sustain the challenged classification, must be applied here on the ground that the classification may affect the right to an education. The Supreme Court has recently decided that the importance of a public elementary and secondary education is not alone sufficient to warrant the application of the stricter standard of review to school financing classifications, San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 29–39, 93 S.Ct. 1278, 1295–1300, 36 L.Ed.2d 16 (March 21, 1973). It follows that a classification affecting the location of a college where financial aid may be spent should not be subjected to the more stringent equal protection test.

We are further satisfied that the classification here under review satisfies the "rational basis" test, whether it be expressed in least stringent terms, e. g., McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), or according to the relatively stricter version indicated by some recent Supreme Court decisions.[5] The record here reveals that the statutory distinction between in-state and out-of-state college attendance bears a substantial relationship to the state's actual, legitimate purpose in alleviating the operating costs of New York schools while at the same time providing financial assistance to certain qualified students to encourage them to seek a higher education. Thus the statutory classification withstands any standard of review short of the "strict scrutiny" test.

The Regents Scholarship Program was first established in 1913 at a time when many western states had developed publicly supported state universities. New York already possessed a number of privately supported institutions and decided to use them to foster more open access to higher education in New York by providing through the scholarship awards a financial alternative to free-tuition public colleges in other states. See Freedom to Pursue a College Education: Recommendations by the State Board of Regents for Modifying and Extending New York State's Student Financial Aid Program 16 (1967). The scholarship program continues despite the development of a low-tuition state university system, and it has been suggested that the in-state restriction be retained, though arguments to the contrary have been recognized, because "the purpose of the student financial assistance program is not only to help the student but also, and equally important, to help build a strong system of colleges in this State, essential for economic and cultural progress." Id. at 27.

To the extent that the Regents Scholarship Program eases for New York residents their burden in paying for the cost of an in-state education and yields funds to the schools in the process, it has the same effect as a system of reduced tuition for in-state residents at publicly supported institutions in New York and other states. These reduced tuition systems, repeatedly withstanding equal protection attack by out-of-state students, have been upheld as contributing to the state's economy and as a means of reasonably attempting to achieve partial equalization of school financing costs between in-state students (or their parents) and out-of-state students (and/or their parents). Starns v. Malkerson, 326 F.Supp. 234 (D.Minn. 1970) (3-judge court), affd., 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971); Kirk v. Board of Regents, 273 Cal.App.2d 430, 78 Cal.Rptr. 260 (1969), appeal dismissed for want of a substantial federal question, 396 U.S. 554, 90 S. Ct. 754, 24 L.Ed.2d 747 (1970); Clarke v. Redeker, 259 F.Supp. 117 (S.D.Iowa 1966) (3-judge court). See also Landwehr v. Regents of University of Colorado, 156 Colo. 1, 396 P.2d 451 (1964) (en banc).

---

5. *Compare* McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961) ("A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it") with more recent Supreme Court pronouncements discussed in Boraas v. Village of Belle Terre, 476 F.2d 806 (2d Cir. 1973), which concluded that for the classification to be sustained it must be "*in fact* substantially related to the object of the statute," *id.* at 814 (emphasis in original), and in Green v. Waterford Board of Educ., 473 F.2d 629 (2d Cir. 1973), which noted that recently the Supreme "Court seems far less willing to speculate as to what unexpressed legitimate state purposes may be rationally furthered by a challenged statutory classification," *id.* at 633. *See* Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972).

We perceive no sound reason why, when a state grants scholarship assistance to resident qualifying students, it may not support the development of its own institutions of higher education, public or private, by similarly encouraging its most intellectually gifted students to attend in-state schools. The Constitution does not limit a state to one mode of supporting its schools. Nor are we persuaded by plaintiff's attempt to distinguish the resident tuition cases on the ground that there all residents of the same state are similarly treated by their home state and all other states, whereas the Regents Scholarship restriction discriminates, as between home-state residents, against those who choose to leave the state to attend college. Like Spatt, the student who chooses not to attend a low-tuition state school might also contend that the State's failure to provide him with an equal measure of assistance so that he might attend another institution (within or without the State) at the same net cost denies him the equal protection of the laws. However, the equal protection requirement does not impose any such straitjacket upon a state, at least where lower tuition rates are provided to resident students attending schools within its own borders as a means of promoting its educational, cultural, and economic progress.

We need not tarry over plaintiff's claim that the in-state restriction on the award of Regents Scholarship funds unconstitutionally burdens interstate commerce. His rather ingenious (though unrealistic) theory is that scholarship grants to qualified residents willing to attend schools here, which he describes as "rebates," amount to de facto taxes levelled against those similarly qualified New York "consumers" who decide to purchase out-of-state college educations. However, the statutory provision in question affects an area which is primarily of local concern. State aid to higher education is historically well within the state police power. Furthermore, it is doubtful whether higher education may be treated as a "commodity" in interstate commerce for the purpose of examining the state's power under Art. I, § 8, cl. 3 of the Constitution to adopt such a provision. See Parker v. Brown, 317 U.S. 341, 361–362, (1943). But even if we assume that higher education regulations may be so examined, the Regents Scholarship restriction fits well within the area of allowable state regulation.

The basic principles delineating the proper scope of local regulation which may affect interstate commerce, however indirectly, were summarized by the Supreme Court in Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 443–444, 80 S.Ct. 813, 816, 4 L.Ed.2d 852 (1960) as follows:

"Evenhanded local regulation to effectuate a legitimate local public purpose is valid unless pre-empted by federal action, . . . or unduly burdensome on . . . interstate commerce. . . .

\* \* \* \* \* \*

"In determining whether the state has imposed an undue burden on interstate commerce, it must be borne in mind that the Constitution when 'conferring upon Congress the regulation of commerce, . . . never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country. . . .' But a state may not impose a burden which materially affects interstate commerce in an area where uniformity of regulation is necessary." (Citations omitted)

No suggestion is made that Congress has pre-empted the field of scholarship assistance to college-bound students, cf. City of Burbank v. Lockheed Air Terminal Inc., 411 U.S. 624, 93 S.Ct. 1854, 36

L.Ed.2d 547 (1973), or that any uniformity of regulation is necessary in that area of concern.

The linch-pin of Spatt's "interstate commerce" argument is that the Regents Scholarship restriction, even though its purpose may be to promote local welfare, invalidly discriminates between interstate and intrastate commerce. See Best & Co. v. Maxwell, 311 U.S. 454, 61 S.Ct. 334, 85 L.Ed. 275 (1940); Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935); Polar Ice Cream & Creamery Co. v. Andrews, 375 U.S. 361, 84 S.Ct. 378, 11 L.Ed.2d 389 (1964). We cannot agree. No disadvantage is imposed by the regulation on the "purchase" of an out-of-state education on the same competitive terms as are normally offered by the out-of-state institution. The situation is therefore quite unlike that in the cases cited immediately above with respect to those who sought to sell their goods in the regulating state. Nothing prevents the regulating state from seeking to make its own "products" more attractive, financially or otherwise, so long as it does not penalize the "products" of other states in crossing its borders. To whatever extent it may be said that the financial incentive of the Regents Scholarship to attend a New York school affects adversely the competitive position of out-of-state colleges in the eyes of New York purchasers, that result is wholly incidental to the direct exercise of the state police power in favor of supporting New York's institutions of higher education by offering financial encouragement to some of the State's most able students, which is permissible. See Head v. New Mexico Board of Examiners, 374 U.S. 424, 427–429, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963).

For the foregoing reasons we hold that the Regents Scholarship restriction is a valid legislative enactment. The complaint is dismissed.

It is so ordered.