**Herbert L. FENSTER, Appellant,**

v.

**Douglas N. SCHNEIDER, Jr., Director of the District of Columbia Department of Transportation.**

No. 79–1844.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 17, 1980.

Decided Nov. 26, 1980.

Herbert L. Fenster, Washington, D. C., with whom Lawrence S. Ebner, Washington, D. C., was on the brief, for appellant.

David P. Sutton, Asst. Corp. Counsel, Washington, D. C., with whom Judith W. Rogers, Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel, and John ·H. Suda, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellee.

Before WILKEY and WALD, Circuit Judges, and MacMAHON,* Chief Judge, United States District Court for the Southern District of New York.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge.

This case raises the issue of whether the District of Columbia School Transit Subsidy Act of 1978, 25 D.C.R. 2534, 2691, D.C.Law 2–152 (hereinafter "the Subsidy Act") which provides for a reduced transportation fare for District resident students on their way to public or private school and educationally related activities in the District, violates Article IV and the fourteenth amendment of the Constitution by discriminating against non-resident students. The district court dismissed the case for failure to state a claim upon which relief could be granted, holding that the residency requirement has a rational basis in that it attempts to allocate the benefits of the school child subsidy among those paying the costs of the subsidy, i. e., District residents, and that the

fact that part of the subsidy is funded through federal revenue sharing does not change the validity of this allocation. We affirm the district court, but elaborate somewhat on its rationale.

## I. Background

Appellant brought this action in the United States District Court for the District of Columbia seeking declaratory judgment and injunctive relief. The relief sought was an invalidation of the District of Columbia School Transit Subsidy Act of 1978 insofar as it provides for a reduced fare (i. e., $.10 as opposed to $.50) for resident students using the Metrobus Transit System within the District to go to and from public or private schools and related educational activities. To be eligible for the subsidy the student must be under nineteen, currently enrolled in any elementary or secondary school in the District and residing in the District. Although a similar subsidy has been in operation since 1931, the residency requirement first appeared in the 1978 Act.

Appellant is the parent of a minor child who travels to school every morning by walking a short distance from his home in Maryland to the District and taking a Metrobus to his school located within the District. The only reason appellant's child is not eligible for the subsidy is his nonresidence in the District.

The Subsidy Act is funded partially (16%) by general revenues of the District of Columbia. Of this portion, 40% derives from a direct payment by the Federal Government to the District. The remaining 84% of the Act's budget consists of District Federal Revenue Sharing Funds.

Appellant contends that because only about 10% of the total funding for the program is "paid for" by District residents, there is no rational relationship between the source of money for the program and the limitation of its benefits to residents; hence it violates the equal protection clause and the privileges and immunities clause of the United States Constitution.

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

## II. *Jurisdiction*

An initial question in this case is whether federal jurisdiction exists over appellant's claim. Originally appellant brought suit under 28 U.S.C. § 1331 and alleged that the $10,000 jurisdictional amount was met either because the cost to the appellee of enforcing the right asserted by appellant would exceed $10,000, citing *Tatum v. Laird,* 444 F.2d 947 (D.C.Cir.1971), *rev'd on other grounds, Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972), and *Committee for G. I. Rights v. Callaway,* 518 F.2d 466 (D.C.Cir.1975), or because the infringement of appellant's constitutional rights is so serious as to require an evaluation in excess of $10,000, citing *Gomez v. Wilson,* 477 F.2d 411 (D.C.Cir.1973), and *Callaway.*[1]

The district court did not address this issue directly. We find it unnecessary to do so now. Plaintiff's allegation of a constitutional violation falls under 28 U.S.C. § 1343, which does not require a jurisdictional amount in controversy and which has recently been amended to include the District of Columbia within the meaning of "state" for purposes of the statute.[2] Since plaintiff asked for an injunction against a continuing wrong, rather than for money damages for a past wrong, both parties agreed at oral argument the pleadings could be amended, if the case were remanded, to base the jurisdiction on 28 U.S.C. § 1343. Rather than require such a judicial formality, we proceed to decide the merits of the issue.

## III. *The Merits of the Claim*

Both parties agree that the standard of review for this case is the rational basis test.[3] Appellant makes a two step argu-

---

1. Appellee argued that the rule which allows the jurisdictional amount to be based on the cost to the defendant of proposed relief does not permit that cost to be aggregated by adding up the claims of members of the entire class which would be affected by the relief, citing *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1962); *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973); and *Snow v. Ford Motor Co.,* 561 F.2d 787 (9th Cir. 1977). Appellant countered that the aggregation rule has no application here because appellant didn't sue as a representative of a class.

   The *Snyder* and *Zahn* cases did not involve the cost-to-defendant rule for computing jurisdictional amount. The *Snow* decision of the Ninth Circuit decided that in a class action suit where each individual plaintiff's claim for damages for an incomplete product amounted to $11.00, a prayer to enjoin defendant from selling the product (which would cost defendant more than $10,000) was an impermissible way of circumventing the *Zahn* rule against aggregation of claims. *But see, Smith v. Washington,* 593 F.2d 1097 (D.C.Cir.1978); *Committee for G.I. Rights v. Callaway,* 518 F.2d 466 (D.C.Cir.1975) (both suggesting that the jurisdictional amount may be met if the prospective cost to the defendant of complying with an injunction exceeds $10,000). *See also* 1 Moore's Federal Practice ¶ 0.91[1]. For the reasons stated in the text we do not attempt to resolve any possible conflict between *Snow* and these cases at this time.

2. 28 U.S.C. § 1343, *as amended by* Pub. L. No. 96–170, 93 Stat. 1283 (1979), reads in pertinent part:

   (a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

   *       *       *       *       *       *

   (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

   *       *       *       *       *       *

   (b) For purposes of this section—(1) the District of Columbia shall be considered to be a State; and (2) any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

   Public Law 96–170, § 3, 93 Stat. 1284, provides that the amendment "shall apply with respect to any deprivation of rights, privileges or immunities secured by the Constitution and laws occurring after the date of enactment of this Act [enacted Dec. 29, 1979]."

3. Although the complaint was based on both the privileges and immunities clause and the equal protection clause, the briefs submitted and oral argument on appeal deal only with the equal protection argument.

   The leading case on the privileges and immunities clause is *Baldwin v. Fish & Game Commission of Montana,* 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978). In deciding that a state statute charging significantly higher rates for elk-hunting licenses to non-residents did not violate the clause the Supreme Court said:

ment to prove that the Subsidy Act does not survive the scrutiny of even this relatively lower threshold. First, appellant argues that the District does not "pay for" any substantial part of the subsidy. Second, he argues that this lack of substantial relationship between the source of funds and the enjoyment of benefits by District residents renders the subsidy irrational. For the reasons stated below, we reject these contentions.

A. *The Standard of Review*

█ It is settled that a state may discriminate in favor of its citizens as long as it has a rational purpose for doing so, *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Although durational residency requirements have been held to a stricter standard of review when they penalize interstate migration by denying basic rights for the durational period, *see Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (denial of welfare assistance to new residents); *Dunn v. Blumenstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (denial of right to v̊ote to new residents); *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (denial of medical financial assistance to new residents), the Supreme Court took care to note in these cases that discrimination based on a residency requirement is different from discrimination based on a durational residency requirement. *Shapiro*, 394 U.S. at 638 n.21, 89 S.Ct. at 1333 n.21; *Dunn*, 405 U.S. at 342 n.13, 92 S.Ct. at 1003 n.13; *Memorial Hospital*, 415 U.S. at 267, 94 S.Ct. at 1086. The note in *Shapiro* specifically suggests a lower

standard of review may be appropriate in non-durational residency requirement cases.

█ Federal courts, noting this distinction in the Supreme Court opinions, have used a rational basis standard of review in cases, like this one, where higher tuition is charged to non-residents attending local schools. *See Arredondo v. Brockette*, 482 F.Supp. 212, 218 (S.D.Tex.1979); *Spatt v. State of New York*, 361 F.Supp. 1048, 1053 (E.D.N.Y.1973), *aff'd*, 414 U.S. 1058, 94 S.Ct. 563, 38 L.Ed.2d 465 (1973). These cases point out that the right to an education is not a fundamental right which might trigger stricter scrutiny, that no suspect class is peculiarly affected by the discriminatory legislation and that a residency requirement, as opposed to a durational residency requirement, does not effect a penalty on interstate migration. *Arredondo*, 482 F.Supp. at 217; *Spatt*, 361 F.Supp. at 1053.[4]

The reasoning is applicable here. Appellant's son has not been deprived of any fundamental right by being denied a lower bus fare; the Subsidy Act, in denying its benefits to non-resident children, does not burden a suspect class of citizens.

B. *The Rational Basis for the School Subsidy*

█ Our next task is to apply the rational basis standard to this case. On this point the Supreme Court said:

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the

Some distinctions between residents and non-residents merely reflect the fact that this is a Nation composed of individual states, and are permitted; ... Only with respect to those privileges and immunities bearing upon the vitality of the Nation as a single entity must the state treat all citizens ... equally. *Id.* at 383, 98 S.Ct. at 1860. The Court explained further that discriminatory legislation must affect a basic right, such as the right to earn a living, which is "sufficiently basic to the livelihood of a Nation that the states may not interfere with a non-resident's participation therein ...." *Id.* 98 S.Ct. at 1862.

Appellant did not argue that the right to a $.40 reduction in bus fare for a child going to a school outside his own community affects any fundamental right "basic to the livelihood of a Nation ..." in violation of the privileges and immunities clause. We therefore deal only with the equal protection argument.

4. *See also Andre v. Board of Trustees of Village of Maywood*, 561 F.2d 48 (7th Cir. 1977), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978) (holding that a residency requirement for municipal employment is to be tested by the rational basis standard); *Wright v. City of Jackson*, 506 F.2d 900 (5th Cir. 1975) (same).

Constitution simply because the classification "is not made with mathematical nicety or because in practice it results in some inequality." "The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." "A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it."

*Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (citations omitted).

Several cases have sustained non-resident differential tuition on the ground that a sufficient rational basis may be found in a state's attempt to equalize the costs of local educational programs between residents and non-residents. These courts notably have not demanded any "mathematical nicety" in the application of this doctrine.

In *Clarke v. Redeker*, 259 F.Supp. 117 (S.D. Iowa 1966), *aff'd*, 406 F.2d 883 (8th Cir. 1969), *cert. denied*, 396 U.S. 862, 90 S.Ct. 135, 24 L.Ed.2d 115 (1969), the court said:

> The defendants justify the discrimination primarily on the basis that resident students or their parents pay taxes to the State of Iowa which, in turn, supports and maintains SUI. The higher tuition charged nonresident students tends to distribute more evenly the cost of operating and supporting SUI between residents and nonresidents attending the University. Although there is no way for this Court to determine the degree to which the higher tuition charge equalizes the educational cost of residents and non-residents, it appears to be a reasonable attempt to achieve a partial cost equalization. The regulation classifying students as residents or nonresidents for tuition payment purposes is not arbitrary or unreasonable and bears a rational relation to Iowa's object and purpose of financing, operating and maintaining its educational institutions.

*Id.* at 123 (footnote omitted). *Accord Kelm v. Carlson*, 473 F.2d 1267 (6th Cir. 1973); *Starns v. Malkerson*, 326 F.Supp. 234, 240 (D. Minn. 1970), *aff'd* 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971).

The fact that the Subsidy Act here is available to residents attending private as well as public schools makes no difference. In *Spatt* the court said that the New York Regents Scholarship Program, providing financial assistance to residents attending private New York schools, was justified by the legitimate interests the state has in providing access to education to its residents and in building a strong system of colleges essential for economic and cultural progress. 361 F.Supp. at 1054.

The underlying assumption of these cases is that the service that the state is providing is funded by the local economy to which residents contribute. Appellant's contention is that the transportation subsidy is distinguishable because so much of the money is "Federal," *i. e.*, provided by non-resident taxpayers like himself.

A similar argument was raised as regards tuition in *American Commuters Association v. Levitt*, 405 F.2d 1148 (2d Cir. 1969). In this case non-residents of New York objected, under the privileges and immunities, equal protection and due process clauses, to paying taxes to the city on the income they earned from employment in the city. Alternatively, they argued that since their tax money was supporting various city services from which non-residents were barred, including lower tuition at New York City College, they should be allowed to use these services on the same basis as residents. The court addressed this latter claim:

> Appellants also present the novel issue that there should be an undiscriminatory interrelationship between taxes and benefits, and if the challenged tax statutes are valid the appellants should be entitled to receive New York's statutory benefits commensurate with New York residents' entitlement to them. . . .

Doubtless appellants' argument has a simple kind of logic, *viz.*: In a situation where non-residents have an identical tax burden with residents, a court could be importuned to order that all who pay the taxes necessary to support state pro-

grams should share equally in whatever benefits those programs provide. But such an argument greatly oversimplifies a very complex matter. Residents and non-residents do not have the identical tax burdens. To be sure, New York State and New York City impose sales and property taxes, and these fall more heavily on those living in the state than on non-residents. Further, New York's challenged income taxes do not reach income earned outside the state by non-residents.

*Id.* at 485.

Appellant argues that *Levitt* is distinguishable from this situation because District residents do not in fact bear a heavier portion of the tax burden used to fund the program, but bear a wholly insignificant burden compared to the benefit they enjoy. This contention rests entirely on the premise that only taxes which go directly from the pockets of District residents into the subsidy program may be considered in equalizing benefits and tax burdens. Thus, appellant argues, the allocation to the subsidy program for the District's federal revenue sharing funds and the federal payment to the District cannot be counted in any cost equalization analysis. There are several answers to these arguments.

### 1. The Federal Revenue Sharing Funds

Federal revenue sharing funds are provided to state and local governments by the State and Local Fiscal Assistance Act of 1972, Pub. L. No. 95–512, 86 Stat. 919 *et seq., as amended by Pub. L. No. 94–488, 90 Stat. 2341 (1976). See* 31 U.S.C. §§ 1221–65. The Senate Finance Committee's report recommending passage of the 1972 Act states its purpose is "[t]o provide the states and localities with a specified portion of federal individual income tax collections to be used by them in accordance with local needs and priorities and without the attach-

ment of strings by the Federal Government." S.Rep.No.1050, 92d Cong., 2d Sess. 1 (1972), U.S.Code Cong. & Admin.News 1972, p. 3874.

The "specified portion" of federal taxes is appropriated to the states from general Treasury funds attributable to federal income taxes. The amount each state receives is determined according to local factors of population, per capita income and *state and local tax collections. See* 31 U.S.C. §§ 1224, 1225, 1228. Thus, although the funds which a locality receives are not a penny for penny return of taxes paid, the statutory scheme does reflect a relationship between local tax efforts and the amount of money received under the revenue sharing program.

The purpose of revenue sharing is further explained in the Senate Report accompanying the 1976 renewal legislation:

A chronic problem State and local governments face is that the demand for public services is more elastic than the availability of revenues to finance them. Thus, because of inflation and other factors, expenditure requirements tend to outpace revenues. On the revenue side, State and local governments have tended to rely on revenue sources that do not grow as the economy does.

The continued provision of general revenue sharing thus not only serves to help solve the fiscal problems of individual State and local governments, but also serves to stabilize the economy.

S.Rep.No.1207, 94th Cong., 2d Sess. 4 (1976), U.S.Code Cong. & Admin.News 1976, p. 5151. As we know too well, the "elasticity" of the demand for services relative to the availability of local revenues to finance these services has produced acute problems for the District, because the nontaxable federal governmental system constitutes such a large part of the Washington economy.[5]

---

**5.** One recent study of the unique demands placed on the District by the presence of the federal government stated:

During the 1970s, the exceptionally high unemployment among black youth and the

lack of any reduction in the number of poverty households, combined with a striking increase in the number of upper-income households, clearly revealed a profound incompleteness in the national government econo-

In sum, federal revenue sharing funds are for the express purpose of fulfilling local needs and priorities. While they do bear a relationship to the tax burden paid by residents of the locality to the federal government, the authors of the legislation specifically wanted them to be used with "no strings attached" to "help to solve fiscal problems of individual state and local governments" that stem from a disparity between taxable sources and demands for municipal services. These goals would be frustrated by a requirement that the programs funded with such money would have to be accessible to any person from anywhere in the country who has paid federal income taxes. As the *Dandridge* Court said, 397 U.S. at 485, 90 S.Ct. at 1161, " 'the problems of government are practical ones and may justify . . . rough accommodations . . .' " rather than the literal penny for penny accountability urged by appellant.

### 2. *Federal Payment to the District*

The direct federal payment used in part to finance the subsidy program is generally viewed as a payment by the federal government to compensate for the extra costs that the presence of the federal government in the District imposes on the local community. In making the request for the payment to the Federal Office of Management and Budget, the Mayor of the District must "identify elements of cost and benefits to the District which result from the unusual role of the District as the Nation's Capital." The elements of that cost-analysis benefit

must include revenues unobtainable because of the relative lack of taxable property and business income, costs of providing services to tax-exempt nonprofit organizations doing business with the federal government and the relative tax burden on District residents compared to that of residents in other jurisdictions in the Washington, D. C. metropolitan area. D.C.Code § 47–2501c (1973 & 1978 Supp.). As the very words of the statute show, the payment is in return for a "cost" to the residents of the District. That "cost" is a burden shared by District residents rather than Maryland or Virginia residents, and District residents are the logical and expected beneficiaries of federal compensation for that "cost."

### 3. *The Purpose of the District of Columbia Elected Board of Education Act*

There is an additional justification for a resident-restricted transportation subsidy. The District has a Congressionally-imposed responsibility to provide education for its residents; it has no such responsibility for non-resident children. D.C.Code § 31–101 (1973) *et seq., Mills v. Board of Education of District of Columbia*, 348 F.Supp. 866 (D.D.C.1972). Provision of transportation to schools—either directly or indirectly by the subsidy—is an intrinsic part of that educational responsibility. Hence a subsidy to resident school children is—without respect to any cost equalization formula—reasonably related to the District's statutory mission and affords a separate rational basis for that subsidy.[6]

---

my. That economy is apparently not broad enough at its base to meet adequately the employment needs of unskilled groups in the population, and it may not be broad enough to sustain the vitality of home rule in the District of Columbia. In any event, the prospect of growth, at whatever rate, in the national government part of Washington's economy offers much less hope to people in the lowest tiers of the economy than to those in higher tiers.

A. E. Shidler, Local Communities and National Government (September 1980) (unpublished report of The Greater Washington Research Center).

**6.** In *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Court

applied the rational basis test to state legislation which set an upper limit on the amount of money a family could receive under an Aid to Families with Dependent Children program, financed jointly by state and federal funds. *It* found that Maryland's interest in encouraging employment and discouraging discrimination between welfare recipients and minimum wage workers was sufficient under this test, 397 U.S. at 484–485, 90 S.Ct. at 1161, and the fact that some federal funds were involved did not affect the state's prerogative in making its own policy choices about a locally administered program. *Cf. Jenkins v. McCollum,* 446 F.Supp. 667 (N.D.Ala.1978) (holding that although a prior durational residency requirement for employment in a federally funded CETA program

## Conclusion

A state, including the District of Columbia, may discriminate between its residents and non-residents for a legitimate governmental purpose. The District's statutory obligation to provide essential educational services to its resident school children, an obligation that does not extend to the school children of neighboring jurisdictions, provides such a justification. An attempt, even though it be imprecise, to partially equalize the costs of a local transportation service for school children between taxpaying residents and nontaxpaying non-residents is sufficient to meet a rational basis standard of review. The District's use of general revenue sharing funds and the federal payment to help pay for the subsidy as part of this attempt to equalize costs is similarly justified on a rational basis theory. For the foregoing reasons, the district court order dismissing the complaint is affirmed.

was constitutionally infirm, a continuing residency requirement as a condition of employment was not, because of the legitimate interest in having only employees familiar with the community participate in the program). Thus the cost equalization formula is only one way of demonstrating the reasonableness of this classification.