Steven **MARTINEZ**, Plaintiff,

v.

**Arizona Attorney General Terry GODDARD. et al., Defendants.**

No. CV 06–19–TUC–FRZ.

United States District Court, D. Arizona.

Sept. 20, 2007.

Steven Martinez, Tucson, AZ, Pro se.

Kathryn J. Winters, Office of the Attorney General, Tucson, AZ, for Defendant.

## ORDER

FRANK R. ZAPATA, District Judge.

Pending before the Court is Defendants' Motion for Summary Judgment and Motion to Dismiss for Failure to State a Claim, and Plaintiff's Partial Motion for Summary Judgment. For the reasons stated below, Defendants' motions are granted and Plaintiff's motion is denied.

## I. DISCUSSION OF THE FOURTEENTH AMENDMENT CLAIMS

### A. Standard of Review: Motion for Summary Judgment

Summary judgment is appropriate where "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* Thus, the "mere scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. *Id.* at 252, 106 S.Ct. 2505. However, in evaluating a motion for summary judgment, "the evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505.

As a threshold matter, the Court notes that Plaintiff failed to conduct any discovery in this case and therefore has not submitted any evidence pertaining to the pending summary judgment motions. The only facts, supported by evidence, before the Court are those submitted solely by Defendants. Thus, there are no disputed factual issues pertaining to the summary judgment motions.

### B. The Fourteenth Amendment Claims

#### 1. *Overview of Plaintiff's Primary Arguments*

A review of Plaintiff's Complaint and the briefing related to the dispositive motions shows that Plaintiff's primary claim in this case is that Arizona's statutory licensing scheme regulating contractors in the construction industry is unconstitutional as it violates Fourteenth Amendment substantive due process and equal protection. Consistent with his Complaint and briefs, which are often rambling and vague as to what allegations support the various claims, Plaintiff does not clearly distinguish the relevant facts and arguments supporting his respective Fourteenth Amendment claims.

Generally, Plaintiff argues that the statutory scheme at issue improperly and unfairly infringes on his right to obtain property, enter into contractual agreements, and otherwise pursue his profession as a carpenter in the construction industry. To the extent there is some governmental classification for purposes of equal protection analysis, the alleged classification is apparently between licensed and unlicensed contractors. The licensing statutes and regulations at issue, which are administered by the Director of the Arizona Registrar of Contractors ("Registrar"), require a state license to engage in most types of substantive construction work, and imposes various requirements to obtain a license which include passing a written examination, having relevant experience, posting a bond based on business

volume, submitting a detailed statement pertaining to one's financial condition, demonstrating good character, and paying an application/renewal fee ranging from $200 to $675 a year. There are exceptions to these licensing requirements. A license is not required for homeowners who themselves build or improve their own property. There is also a "handyman exception" which generally allows an unlicensed person to conduct construction work if the total aggregate price is less than $1000. To the extent one of these exceptions does not apply, an unlicensed contractor can be subject to civil or criminal penalties for contracting without a license. In addition, to the extent an unlicensed contractor advertises, the unlicensed contractor must state that he is an "unlicensed contractor" in the advertisement; failure to comply with this requirement can also result in penalties.

As he is an unlicensed contractor, Plaintiff argues that this statutory scheme unconstitutionally hinders his right to obtain property, enter into contractual agreements, and otherwise pursue his profession. Plaintiff argues that to the extent the purpose of the licensing scheme seeks to ensure quality construction and protect the public from poor construction work from unskilled or unscrupulous contractors, the licensing scheme fails to achieve its purpose. For example, Plaintiff argues that the licensing scheme has a "qualifying party" provision which allows one person to obtain a contractor's license on behalf of an entire business entity (i.e., the business entity becomes a licensed contractor based on the one qualifying party) which will allow that business entity to legally perform any relevant contracting work. Thus, every single employee of that contracting business does not have to obtain a license; only one member of that business must be a "qualifying party" such that the business entity can obtain a license to com-ply with the licensing scheme. Plaintiff argues that once there is one qualifying party which is part of that contracting business, there could be countless other employees working for that same business who are unlicensed and are performing contracting work in the construction industry. In addition, as the licensing scheme does not require the "qualifying party" to be on site to manage every aspect of a construction project, Plaintiff argues that there is not sufficient supervision on every project which undercuts the purpose of the licensing scheme. In addition, in light of the "qualifying party" provision, Plaintiff also argues that the licensing scheme favors business entities with numerous employees over the contractor who chooses to work on his own. Although Plaintiff does not make this clear, apparently this may be another classification for purposes of equal protection analysis. Plaintiff argues that it is unfair that only one person for an entire business entity needs to meet all of the licensing requirements to comply with the statutory scheme, while an individual who chooses to work on his own must meet the same basic requirements as well which is more of a burden for an individual.

As discussed below, as no suspect class or fundamental right is involved, rational basis review applies to the constitutional inquiry in this case. Plaintiff has failed to meet his high burden of showing that the statutory scheme fails the rational basis test and therefore can not show a constitutional violation.

2. *Substantive Due Process and Equal Protection: Economic Liberties and Deferential Rational Basis Review*

■ "To withstand Fourteenth Amendment scrutiny, a statute is required to bear only a rational relationship to a legitimate state interest, unless it makes a suspect classification or implicates a funda-

mental right." *Nat'l Ass'n for Advancement of Psychoanalysis v. California Board of Psychology,* 228 F.3d 1043, 1049 (9th Cir.2000). Suspect classifications whose use triggers a strict scrutiny analysis include classifications based on race, nationality, and alienage. *See Benson v. Arizona State Board of Dental Examiners,* 673 F.2d 272, 278 n. 15 (9th Cir.1982).[1] None of these suspect classifications are applicable in this case. Fundamental rights include the right to marry, the right to live with family, the right to marital privacy, and the right of parents to direct their children's upbringing and education. *See Nat'l Ass'n for Advancement of Psychoanalysis,* 228 F.3d at 1049 (fundamental rights include "those ties that have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs")(internal quotes and citations omitted); *Armendariz v. Penman,* 75 F.3d 1311, 1319 (9th Cir.1996)(fundamental rights protect "against a State's interference with personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education, as well as with an individual's bodily integrity ... These areas represent a realm of personal liberty which the government may not enter."). None of these fundamental rights are applicable in this case. As no suspect classifications or fundamental rights are implicated, the Court must apply the rational basis test to the licensing scheme at issue.

As a threshold matter, the Court notes that Plaintiff does not cite any viable case law that reflects the current state of federal constitutional law pertaining to substantive due process and equal protection analysis. *See* Erwin Chemerinsky, Constitutional Law: Principles and Policies §§ 8.1, 8.2, 8.3 (3rd Ed.2006). The claims at issue in this case pertain to economic liberties, and do not implicate any fundamental rights or suspect classifications warranting anything other than rational basis review. *See id.*

A review of the cases Plaintiff cites shows that nearly all of those cases are from approximately 1890 to 1920. While many of those cases are factually similar and favorable to Plaintiffs position in regards to his economic liberties, and Plaintiff would have a strong position if his case had been filed in the early 20th century, those cases no longer reflect the current state of the law pertaining to economic liberties which pertain to the ability to enter into and enforce contracts; to pursue a trade or profession; and to acquire, possess, and convey property. *See id.* The cases Plaintiff cites are a reflection of the *Lochner*[2] era (approximately 1897 to 1937) whereby the United States Supreme Court aggressively protected economic rights under the due process clause. *See id.* at § 8.1, p. 606. During this era, the Supreme Court found that freedom of contract was a basic right under the liberty and property provisions of the due process clause and applied a stringent standard of review to laws regulating economic liberties. *See id.* As such, many state laws aimed at protecting workers and consumers, such as minimum wage and maximum hour statutes, were declared unconstitutional as violating freedom of contract pro-

---

1. Quasi-suspect classifications which require a level of scrutiny less than strict scrutiny and more than rational basis scrutiny (i.e., intermediate scrutiny) include classifications based on gender and illegitimacy. *See Benson,* 673 F.2d at 278 n. 15. None of these quasi-suspect classifications are at issue in this case.

2. *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905); *see also Allgeyer v. Louisiana,* 165 U.S. 578, 17 S.Ct. 427, 41 L.Ed. 832(1897).

tected by the Fourteenth Amendment; it is estimated that approximately 200 state laws were declared unconstitutional during the *Lochner* era. *See id.* at § 8.1, p. 606; § 8.2, p. 616–620. Many of the decisions of the *Lochner* era reflected a philosophical commitment to a laissez-faire economy and to protecting business from government regulations. *See id.* at § 8.1, p. 607; § 8.2, pp. 620–621.

"For the last 60 years, [however], commentators and Justices have repudiated the *Lochner* era decisions." *Id.* at § 8.2, p. 620. In *West Coast Hotel v. Parrish,* the Supreme Court upheld a state law that required a minimum wage for women; in abandoning the principles of the *Lochner* era, the Supreme Court stressed: "What is this freedom [of contract]? The Constitution does not speak of freedom of contract. It speaks of liberty and prohibits the deprivation of liberty without due process of law ... [R]egulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process." 300 U.S. 379, 391, 57 S.Ct. 578, 81 L.Ed. 703 (1937). In *United States v. Carolene Products Co.,* the Supreme Court held that economic regulations should be upheld so long as they are supported by a conceivable rational basis, even if it cannot be proved that it was the legislature's actual intent. *See* 304 U.S. 144, 152, 58 S.Ct. 778, 82 L.Ed. 1234(1938).

In *Williamson v. Lee Optical,* the Supreme Court upheld an Oklahoma statute that prohibited an optician (an artisan qualified to grind lenses, fill prescriptions, and fit frames) from fitting or duplicating lenses without a prescription from an optometrist or an ophthalmologist. *See* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). The district court found that the statute was unconstitutional as it had no rational connection to protecting the welfare of the public in light of the undisputed fact that

another prescription was totally unnecessary if a person broke a pair of glasses and simply wanted to replace them; under these circumstances, an optician could easily measure the power of the lenses and duplicate them without a new prescription from an optometrist or an ophthalmologist. *See id.* at 486, 75 S.Ct. 461. As such, the district court found that the means chosen to effectuate the purpose of the statute was not necessary or otherwise rationally related to achieving the goal in question. *See id.* Thus, the district court held that the statute arbitrarily interfered with the optician's right to do business and found that the statute violated Fourteenth Amendment due process. *See id.* The Supreme Court reversed, and stressed the deference owed to a state legislature's regulation of economic liberties:

**The Oklahoma law may exact a needless, wasteful requirement in many cases. But it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement.** It appears that in many cases the optician can easily supply the new frames or new lenses without reference to the old written prescription. It also appears that many written prescriptions contain no directive data in regard to fitting spectacles to the face ... **But the law need not be in every respect logically consistent with its aims to be constitutional. It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it ... The day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought**

... [The District Court also improperly found that the statute violated equal protection because the regulations only applied to opticians, but did not apply to similarly situated businesses as it exempted all sellers of ready-to-wear glasses.] ... The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think ... Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind ... The legislature may select one phase of one field and apply a remedy there, neglecting the others ... The prohibition of the Equal Protection Clause goes no further than the invidious discrimination. We cannot say that that point has been reached here. For all this record shows, the ready-to-wear branch of this business may not loom large in Oklahoma or may present problems of regulation distinct from the other branch.

*Id.* at 487–489, 75 S.Ct. 461; *see also Armendariz*, 75 F.3d at 1318 (9th Cir. 1996)(the *Lochner* era "now symbolizes an era in which the Court, invalidating economic legislation, engaged in a level of judicial activism which was unprecedented in its time and unmatched since."); *Nat'l Ass'n for Advancement of Psychoanalysis*, 228 F.3d at 1051 (9th Cir.2000)(stating that "the *Lochner* era has long passed ..."); *Madarang v. Bermudes*, 889 F.2d 251, 254 (9th Cir.1989)("The days when courts regularly struck down economic legislation on substantive due process grounds, as in *Lochner* ... have long since passed. It is abundantly clear today that economic regulation of professional services need not violate substantive due process."); *In re Crawford*, 194 F.3d 954, 961 (9th Cir. 1999)("... in the *post-Lochner* era a restriction on the conduct of a profession will run afoul of substantive due process rights only if it is irrational ... In order to prevail, [Plaintiff] must establish that [the statute] is clearly arbitrary and unreasonable ...")(internal quotes and citations omitted).

 As only rational basis review applies, the licensing scheme must be upheld as long as it is:

Rationally related to a legitimate state interest ... In applying the rational basis test, we presume the constitutionality of the classification. [T]nose challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision-maker ... [W]e do not require that the government's action actually advance its stated purposes, but merely look to see whether the government could have had a legitimate reason for acting as it did ... We need only determine whether the licensing scheme has a conceivable oasis on which it might survive rational basis scrutiny.

*Nat'l Ass'n for Advancement of Psychoanalysis*, 228 F.3d at 1050–1051 (9th Cir. 2000).

As Defendants correctly argue, as reflected in decisions of both the Arizona Supreme Court and the Ninth Circuit, the licensing of contractors in Arizona serves a legitimate state purpose. The Arizona Supreme Court has stated:

We have repeatedly held that the purpose of [the licensing scheme] is to protect the public from unscrupulous, unqualified, and financially irresponsible contractors. *E.g., Westinghouse Elec. Corp. v. Rhodes*, 97 Ariz. 81, 84, 397 P.2d 61 (1964) ("Statutes relating to licensing requirements for contractors

are regulatory measures designed for protection of the public against the unscrupulous and unqualified."); *Sobel v. Jones*, 96 Ariz. 297, 300, 394 P.2d 415 (1964) ("The statutory purpose ... is to prevent unscrupulous or financially irresponsible contractors from deceiving and taking advantage of those who engage them to build.") ... *Northen* itself acknowledged that the statute was designed to protect the public "against unscrupulous and unqualified persons purporting to nave the capacity, knowledge and qualification of a contractor." *Northen*, 72 Ariz., at 172, 232 P.2d 111 ...

*Aesthetic Property Maintenance Inc. v. Capitol Indem. Corp.*, 183 Ariz. 74, 77, 900 P.2d 1210 (1995); *see also City of Phoenix v. Superior Court In and For Maricopa County*, 109 Ariz. 533, 537, 514 P.2d 454 (1973)("The purpose of the licensing statute is to provide protection for the public that contractors have the requisite skill and ability to perform the required work.").

The Ninth Circuit has also recognized the legitimate purpose of Arizona's licensing scheme:

> The purpose of licensing building contractors is for the protection of the public ... The legislature gave to the Registrar of Contractors the duty to require that those involved in constructions of structures and improvement to real property have the required skill, training and ability to accomplish such construction in a safe and workmanlike fashion
>
> ... **All of these requirements, taken together, are designed to protect members of the general public without regard to the impact upon individual contractors.**

*Urbatec v. Yuma County*, 614 F.2d 1216, 1218 (9th Cir.1980)(emphasis added).

The challenged licensing scheme is rationally related to the legitimate purpose of protecting the public. To help ensure safe, quality construction and to protect against irresponsible contractors, the licensing scheme requires contractors to meet numerous requirements which include a written examination, having relevant experience, posting a bond based on business volume, submitting a detailed statement pertaining to one's financial condition, demonstrating good character, and paying an application/renewal fee ranging from $200 to $675 a year. Furthermore, the Registrar is empowered to investigate complaints against licensed contractors, order licensed contractors to remedy problems if necessary, and ultimately suspend or revoke licenses due to poor construction practices or unscrupulous behavior which detrimentally impacts the public. A Residential Contractors' Fund has also been created by the legislature which deals with damages for improper construction and injuries caused by a licensed residential contractor; the fund has paid out over $50 million dollars and has paid out an average of $4.1 million over the last five years. The licensing scheme is rationally related to a legitimate state interest.

As discussed above, Plaintiff argues that the licensing scheme is ineffective and otherwise does not protect the public due to the qualifying party provision. As the qualifying party is not required to be on site to supervise every aspect of a construction project, he argues that the public is not protected. As such, he asserts that the classification between licensed and unlicensed contractors is illegitimate. In addition, he argues that the qualifying party provision unfairly favors businesses over individuals who work alone.

Plaintiff has not met his burden to show that the licensing scheme is unconstitutional under the rational basis test. Vari-

ous types of businesses can apply for a contractor's license: a sole proprietorship, a trust, a partnership, a limited liability corporation, or a corporation. Every license applicant must have a qualifying party. The licensing scheme requires the qualifying party to pass a written examination and have relevant experience in the field, and the license applicant (which may be a business entity) must post a bond, demonstrate good financial condition, and good character. Having this qualifying party on every license representing a particular business advances the purpose of the licensing scheme. The qualifying party must be regularly employed and actively engaged in the business holding the license, may have an ownership interest in the license, and can not have any other employment or duties that would conflict with his duty to oversee work performed by the licensee. Furthermore, all "persons" on the license, as defined by A.R.S. § 32–1122, which includes the qualifying party, and partners, directors, officers or owners of the business (with a 25% stake in the business), are all ultimately responsible for ensuring that work performed meets minimum workmanship standards. The licensing scheme's requirement of a qualifying party on every license is meant to ensure that someone knowledgeable in the particular trade for which the license is issued is available to provide proper corrective measures if problems arise due to improper workmanship. In light of these considerations, even if a qualifying party is not on site to supervise every aspect of a project, the qualifying party provision does not render the licensing scheme ineffective, arbitrary, or irrational; the statute appropriately distinguishes between licensed and unlicensed contractors

to advance its legitimate purpose. Furthermore, Plaintiff's argument that the licensing scheme unfairly discriminates in favor of businesses over contractors who work by themselves is without merit. As Defendants correctly argue, Plaintiff may choose to apply and obtain a contractor's license and work totally alone with no employees. Plaintiff may also choose to apply and obtain a contractor's license and hire employees to work for him. Regardless, the licensing scheme would require the entity holding the license to have a qualifying party, which may or may not be Plaintiff. It is the applicant's determination as to what type of business applies for a contractor's license, not the Registrar or any State statute or regulation.

To the extent Plaintiff argues the reciprocity agreements between the Arizona Registrar and its counterparts in California, Nevada, and Utah somehow violates his Fourteenth Amendment rights, Plaintiff has not adequately demonstrated how any of these constitutional rights were violated. The reciprocity agreements only apply to the waiver of the written examination requirement; every other aspect of the licensing scheme is equally applicable and contractors from these states must obtain an Arizona contractor's license prior to performing any contracting work in Arizona. Although his claims are ambiguous, to the extent Plaintiff asserts claims for violations of his right to travel and abridgement of his privileges or immunities of national citizenship under the Fourteenth Amendment, his claims are without merit. Under contemporary decisions pertaining to an alleged right to travel violation and related claims for abridgment of the Privileges or Immunities Clause of the Fourteenth Amendment,[3] statutes have

---

3. The Privileges or Immunities Clause of the Fourteenth Amendment is a "long dormant" constitutional provision that has only recently

been revived in relation to protecting the right to travel. *See Russell v. Hug,* 275 F.3d 812, 822 and 822 n. 11 (9th Cir.2002)(the Privi-

been struck down only where durational residency requirements have been imposed such that a person must live in a jurisdiction for a specified amount of time in order to receive important government benefits such as welfare proceeds, the right to vote, and free medical care. *See Benson v. Arizona State Bd. Of Dental Examiners,* 673 F.2d 272, 277 (9th Cir.1982); *Russell v. Hug,* 275 F.3d 812, 822 (9th Cir.2002); *Paciulan v. George,* 229 F.3d 1226, 1229 (9th Cir.2000); *Saenz v. Roe,* 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). These types of issues are not present in this case; Plaintiff's right to travel and privileges or immunities of national citizenship claims are without merit.

Plaintiff has failed to show that the licensing scheme is not rationally related to legitimate state interests. Plaintiff's Fourteenth Amendment equal protection claim, substantive due process claim, and privileges or immunities of national citizenship claim are dismissed.

## II. *DISCUSSION* (Remaining Claims in Counts 4 and 5)

■ Defendants have moved to dismiss the remaining claims in this case for failure to state a claim. The dispositive issue raised by a Rule 12(b)(6) motion is whether the facts as pleaded, if established, support a valid claim for relief. *See Neitzke v. Williams,* 490 U.S. 319, 328–329, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). In reviewing a motion to dismiss for failure to state a claim, this Court's review is limited to

the contents of the complaint. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 754 (9th Cir.1994). All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *Id.* However, a court need not accept as true conclusory allegations, legal characterizations, unreasonable inferences, or unwarranted deductions of facts. *See Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001); *Cholla Ready Mix, Inc. v. Civish,* 382 F.3d 969, 974 (9th Cir.2004); *Taylor v. F.D.I.C.,* 132 F.3d 753, 762 (D.C.Cir. 1997); *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996)(stating that a court need not "swallow the plaintiff's invective hook, line, and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited.").

In addition to the claims dismissed above, Plaintiff has also requested injunctive and declaratory relief by summarily asserting that the licensing scheme violates the Interstate Commerce Clause, Sherman Act, Clayton Act, 42 U.S.C. §§ 1981, 1983, 1985, 1988, and his rights under Article IV(§ 2) and the Fifth, Seventh, and Thirteenth Amendments of the United States Constitution. A review of the Complaint and the briefing in this case shows that Plaintiff has failed to allege any relevant facts connected to these specific claims or cite any relevant case law to support these specific claims. In response to Defendants' motion to dismiss these claims for failure to state a claim, Plaintiff states: "Plaintiff is asking the court to determine if there is a constitutional violation And what parties have what rights. Plaintiff did ask the court for any other Relief this court deem proper. Plaintiff

___

leges or Immunities Clause of the Fourteenth Amendment has traditionally been viewed as "utterly incapable of performing any real work in the protection of individual rights against state interference."; the Clause was

recently applied by the Court in *Saenz* in the right to travel context)(internal quotes and citations omitted); *Saenz v. Roe,* 526 U.S. 489, 119 S.Ct. 1518, 143 L.Ed.2d 689 (1999).

did not consider it proper to File court proceeds against persons that this court may deem As not acting under the color ... The Inter State (antitrust) commerce Question ... Would be answer by the Court. Plaintiff would have no ideas of the resolution to this problems, he is asking the court if this is a antitrust action." *See* Plaintiff's Response to Motion for Summary Judgment/Motion to Dismiss at 4 (grammatical errors in the original). After making these statements, Plaintiff summarily states that the licensing scheme is unconstitutional as it gives special treatment to certain groups under the color of law. *See id.* As the Court need not accept as true conclusory allegations, legal characterizations, unreasonable inferences, or unwarranted deductions of facts, Defendants' motion to dismiss these conclusory claims is granted. *See Sprewell,* 266 F.3d at 988; *Cholla Ready Mix, Inc.,* 382 F.3d at 974; *Taylor,* 132 F.3d at 762; *Aulson,* 83 F.3d at 3.

Furthermore, Plaintiff's remaining claims lack a legal basis. As to the Privileges and Immunities Clause of Article IV, Section 2 of the Constitution, out-of-state residency is a necessary requirement which is lacking in this case (i.e., Plaintiff, an Arizona resident, is challenging an Arizona licensing scheme). *See Russell,* 275 F.3d at 822. As to the Fifth Amendment, Plaintiff claims violations of due process; however, the Fifth Amendment only protects against federal governmental action infringing on life, liberty, or property which is not at issue in this case. *See Fidelity Financial Corp. v. Federal Home Loan Bank,* 792 F.2d 1432, 1435(9th Cir. 1986). As to the Seventh Amendment, Plaintiff asserts that the statutory scheme deprives him of his right to a jury trial; while the Seventh Amendment addresses jury trials, there is nothing in the licensing scheme that deprives Plaintiff of a right to any jury trial under the circumstances at issue in this case. Plaintiff's Thirteenth Amendment claim, which bans slavery, also is inapplicable to the case at bar. As 42 U.S.C. § 1981 is only applicable to race discrimination, and race discrimination is not at issue in this case, Plaintiff's claim under this statute is unfounded. *See Jones v. Bechtel,* 788 F.2d 571, 574 (9th Cir.1986). As to 42 U.S.C. § 1985, this statute pertains to two or more persons conspiring to deprive or prevent individuals, by "force intimidation, or threat," from exercising their civil rights; this is not such a case. *See* 42 U.S.C. § 1985(1), (2), and (3). As to 42 U.S.C. § 1988, this statute pertains to the awarding of attorneys' fees and expert fees in civil rights cases, and is not a ground for substantive relief under the circumstances of this case. *See* 42 U.S.C. § 1988(1), (2), (3). As to Plaintiff's ambiguous anti-trust claims pursuant to the Interstate Commerce Clause, Clayton Act, and Sherman Act, Plaintiff concedes that as to the "Inter State (antitrust) commerce Question ... Would be answer by the Court. Plaintiff would have no ideas of the resolution to this problems, he is asking the court if this is a antitrust action." *See* Plaintiff's Response to Motion for Summary Judgment/Motion to Dismiss at 4 (grammatical errors in the original). A review of the Complaint and briefing in this case shows that this is not an anti-trust case warranting relief under the provisions asserted by Plaintiff; in addition, the State of Arizona is immune from anti-trust liability as it acted in its sovereign capacity in enacting the licensing scheme at issue *See generally John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495 (9th Cir.1977); *William Inglis & Sons Baking Co. v. ITT Continental Co., Inc.,* 668 F.2d 1014 (9th Cir.1981); *see also Benson v. Arizona State Bd. Of Dental Examiners,* 673 F.2d 272, 277 (9th Cir. 1982). Lastly, as 42 U.S.C. § 1983 simply

provides an avenue to hold state or local actors liable for substantive civil rights violations, and the Court has found that there are no cognizable violations at issue in this case, Plaintiff's § 1983 claim is unfounded. *See* 42 U.S.C. § 1983.

## III. CONCLUSION

Accordingly, IT IS HEREBY ORDERED as follows:

(1) Defendants' Motion for Summary Judgment and Motion to Dismiss (Doc. # 20) are **granted.**[4]

(2) Plaintiff's Partial Motion for Summary Judgment (Doc. # 22) is **denied.**

(3) This case is **dismissed with prejudice.** The Clerk of the Court shall **enter judgment accordingly.**

---

4. The Court notes that Defendants also filed a motion to dismiss for lack of standing. *See* Doc. # 19. As the Court is dismissing this case on other grounds, the motion to dismiss for lack of standing is summarily denied as moot.